## EDWARD S. ROWLAND vs. ROBERT ROWE.

The plaintiff purchased soon after its date a promissory note endorsed by the defendant, payable in six months. The maker informed him at the time that the defendant was his father-in-law, and lived with him in East Haven, the town next adjoining the city of New Haven, where the plaintiff lived, and at a bank in which the note was payable; the note was also dated there. The defendant was in fact then living in East Haven, and had been for forty years. On the day that the note fell due the plaintiff left it with the bank where it was payable, instructing the cashier, who was also a notary, to protest it if not paid, and telling him that the endorser lived in East Haven. The note not being paid the notary protested it, and after enquiry of two of the clerks who lived near the line of East Haven, as to the defendant's residence, and being informed that they did not know him personally but believed he lived in East Haven, and after enquiry of some other persons who he thought might know without getting any definite information, he mailed a notice to him at that place on the afternoon of the same day. The defendant had in fact some time before, but after the purchase of the note by the plaintiff, removed to New Haven. Held that the notice of non-payment was sufficient.

The plaintiff having ascertained the truth with regard to the defendant's residence at the time of the purchase of the note, might rest upon that knowledge, and was not thereafter called to make any inquiry into the matter until some information came to him which made it his duty to do so.

The note fell due on Saturday, July 3d. The following Monday was a national holiday. On the afternoon of Tuesday the plaintiff, learning that the note remained unpaid, went to East Haven to find both maker and endorser. He there learned that the maker had left the state and that the defendant had removed to New Haven. It was then about dark, and he returned home by a direct route, which did not lead him by the residence of the defendant, he supposing that the notary had legally protested the note. At this time the business of the day was closed, the note was in the vault of the bank, which was shut, and the notary had gone to his home in an adjoining town. Held that practically and in the eye of the law the information came to the plaintiff on Wednesday the 7th, and therefore placed no obligation on him or on the notary to send a second notice. [Two judges dissenting.]

CIVIL ACTION against the defendant as endorser of a promissory note; brought to the Court of Common Pleas of New Haven County, and tried to the court, on a denial of the principal allegations, before *Stoddard, J.* The following facts were found by the court:—

The note in suit was dated at East Haven, January 1st, 1880, was signed by George A. Hubbard, was for $300, payable at the Second National Bank of the city of New Haven

six months from its date, and was endorsed by the defendant, to whose order it was made payable. Soon after it was executed Hubbard, the maker, brought it to the plaintiff's office for discount. The plaintiff enquired of him where he lived, and who Rowe, the indorser, was. Hubbard told him that he lived in East Haven, just this side of one Mr. Hughes, whose name appears hereafter, and that Rowe was his father-in-law, and boarded with him; and that Rowe was a man who owned considerable property in East Haven, and had lived there most of his lifetime. The plaintiff thereupon discounted the note, and saw nothing more of Hubbard until a day or two before the maturity of the note, when the latter informed him that he would be in to pay the note when it fell due, and if not that the money would be in the bank where the note was made payable, to meet it.

On the 3d day of July, 1880, about noon, the plaintiff took the note to the bank where it was made payable, and left it with the bank for collection, at the same time telling Mr. I. K. Ward, cashier of the bank, and the notary who protested notes for the bank, that if the note was not paid at 3 P. M., the hour the bank closed, to protest it. Ward inquired of the plaintiff where the indorser lived; the plaintiff informed him that he lived in East Haven, and boarded with the maker of the note. Up to that time the plaintiff did not know or suspect that the defendant resided elsewhere than in East Haven.

At 3 P. M., the note not being paid, Ward presented the same to the teller of the bank for payment, which was refused. He then asked two of his clerks in the bank who reside in Fair Haven, and near to the river which separates Fair Haven from East Haven, as hereinafter mentioned, and whom he believed to be pretty generally acquainted with East Haven people, where Rowe lived. They both replied that they did not know him, but believed that he lived in East Haven. Ward also went to the plaintiff's office to make further inquiries of him as to Rowe's residence, and not finding him in, inquired of his clerks, but they told him they did not know. Ward that evening mailed in the post office

in New Haven a notice, proper in form, of the non-payment of the note, prepaid, and addressed to the defendant at East Haven, Connecticut. At the time he mailed this notice he did not know or suspect that the defendant lived elsewhere than in East Haven, and did not know of any one else of whom he could obtain any information on the subject. Ward was not a resident of either the city or town of New Haven, but resided in the village of West Haven in the town of Orange. At the time the notice was mailed the defendant's name was not in the directory of the city of New Haven.

On the sixth day of July, 1880, the plaintiff went into the bank to see if Ward had received any reply to the notice of protest, and finding he had not, late in the afternoon of that day, he, with his daughter, drove to East Haven for the purpose of finding the maker of the note and the defendant, and about sundown arrived at the house of Mr. Hughes, the person spoken of by Hubbard at the time the note was discounted, and who lived in East Haven, about a mile and a half from that part of Fair Haven to which the defendant moved as hereinafter mentioned. The plaintiff inquired for Hubbard, and was informed by Hughes that he had gone to parts unknown one or two days before the maturity of the note, and that he had no property. The plaintiff then inquired for the defendant, and was told by Hughes that he had removed to Fair Haven, and was living on the corner of James and Exchange streets with a man named Jones, his son-in-law, about seventy-five rods off from the plaintiff's direct road back to New Haven, though this road was not the one in fact traveled by him on this occasion. Fair Haven is a part of the city of New Haven, and lies on the east side of the town of New Haven, has a separate post office known as the Fair Haven post office, and is situated next adjoining the town of East Haven, from which it is separated by a small river, bridged at several points from Fair Haven to East Haven. The plaintiff left Hughes's place about dark and returned by the road he had gone, and reached his home in the city of New Haven after dark, supposing that Ward, being a notary public, and cashier of the bank, had protested

the note according to law. The house in which Jones lived
was then owned by the plaintiff, but the plaintiff did not
know, till Hughes told him, what connection of the defendant
Jones was, and had never before heard or known that the
defendant lived there.

The same evening the plaintiff wrote and mailed the
following letter to the defendant, and which was postmarked
11 P. M. of that day:—

"New Haven, Conn., July 7th, 1880.
"Mr. Robert Rowe:

"Will you please to call and see me to-day on business of
importance, and oblige yours,        E. S. Rowland."

And on the 8th of July he wrote and mailed to him a
postal card requesting him to call at the Second National
Bank. Both were addressed to the defendant, "Corner of
James and Exchange streets, New Haven." The first was
received by the defendant July 7th, and the second July 8th.
Also on the 10th of July, Ward, at the request of the plain-
tiff, wrote the following letter to the defendant, and mailed
it addressed as the foregoing letters sent by the plaintiff.
The defendant received it at 12.15 P. M., July 12th.

"New Haven, Conn., July 10th, 1880.
"Mr. Robert Rowe:

"*Dear Sir*—The note of George A. Hubbard for $300 on
which you are endorser, due and protested for non-payment
on 3d inst., still remains unpaid. You will please give it
your immediate attention, and oblige. Respectfully yours,
I. K. WARD, *Cashier.*"

The plaintiff first informed Ward that the defendant had
removed to Fair Haven at the time this letter was written,
and Ward wrote and mailed it immediately upon being so
informed and while the note was still lying in the bank for
collection.

The defendant, who is a man sixty-five years of age, has
followed, until a year or two past, the business of steamboat-
ing, and resided in East Haven from the year 1839 till Feb-
ruary 28th, 1880, and for the last twenty-five years of that

time had lived in his own house, and Hubbard had lived with him for the last year or two prior to that date. On the last date the defendant removed to Fair Haven, intending to make that his home, and took with him his furniture, which was enough for one room, and Mrs. Jones supplied him with his meals. On March 31st, 1880, the defendant went to England on a visit, and did not return till May 11th. The defendant was a man who received but very few letters, and these he generally received, both while residing in East Haven and Fair Haven, at the steamboat dock in New Haven. These were directed "Steamboat Dock, New Haven." He had never received any letter from the Fair Haven post office up to the time of the trial, nor from the New Haven post office. The place where he resided in Fair Haven is about a mile from the Fair Haven post office and about the same from that of New Haven, and is about two miles from the East Haven post office. The defendant never used to go to either the Fair Haven, New Haven, or East Haven post offices, and he used to come to the central part of the city of New Haven only once or twice a week, and he then came to his daughter's house, or to a certain grocery store, or to a place where newspapers were sold. After his return from England he spent most of his time, especially in fair weather, working on the land where his house had stood in East Haven, for Jones, to whom he had conveyed the property.

The defendant received in East Haven on July 12th, at 11.45 A. M., the first notice of the non-payment of the note sent by Ward. It was then handed to him by his son, who had received it on Saturday, July 10th, in the afternoon, from one Forbes, to whom the postmaster had given it to be carried to the defendant. The son did not then reside with the defendant, but across the river on the East Haven side.

Upon these facts the plaintiff claimed and asked the court to rule:

1. That he had used due and reasonable diligence in endeavoring to ascertain the residence of the defendant and in sending the notice of non-payment.

2. That said Ward and the Second National Bank had

used due and reasonable diligence in endeavoring to ascertain the residence of the defendant and in sending him notice of non-payment.

3. That the plaintiff and Ward were justified, under all the circumstances, in sending the notice as it was sent.

4. That the notice as sent was due notice to the defendant of non-payment of the note, and that under all the circumstances, neither the plaintiff, nor the bank, nor Ward, was bound to send any other notice, or to any other place.

But the court overruled all these claims of the plaintiff, and rendered judgment against him. The plaintiff moved for a new trial.

*C. S. Hamilton,* in support of the motion.

1. Due diligence was used in the first instance, in sending the defendant the notice of non-payment which was mailed to him on the 3d day of July. The place of the date of a note is the place to which the notice of dishonor should be sent, unless the holder actually knows, or has good reason to suppose, that the indorser resides elsewhere. *Bank of Utica* v. *Davidson,* 5 Wend., 587; *Sasscer* v. *Whitely,* 10 Maryl., 98; *Moodie* v. *Morrall,* 1 Const. R. (S. Car.), 367; *Page* v. *Prentice,* 5 B. Monr., 7; *Godley* v. *Goodloe,* 6 Sm. & Marsh., 255; *Peters* v. *Hobbs,* 25 Ark., 67. In case of permanent removal by the indorser, between the making of the note and the dishonor, the notice should be sent to the place where the indorser resided at the time of making the note, unless the holder know, or has good reason to know, of such change of residence. *Ward* v. *Perrin,* 54 Barb., 89; *Bank of Utica* v. *Phillips,* 3 Wend., 408; *Harris* v. *Memphis Bank,* 4 Humph., 519; *McGrew* v. *Toulmin,* 2 Stew. & P., 428. If the notice is sent to the place where the indorser is reported to live it is sufficient. *Wood* v. *Corl,* 4 Met., 203. Where an indorser has intrusted his name to the maker of the note, he is bound by a notice sent to the place which the maker has told the holder, at the time of discount, is his residence. *Bank of Utica* v. *Phillips,* 3 Wend., 408; *Bank of Utica* v. *Bender,* 21 Wend., 643; *Gawtry* v. *Doane,* 51 N. York, 84. Inquiry

in good faith by the notary having the note for protest of
any one person whom he has reason to believe knows where
the indorser resides, is the exercise of proper care in sending
the notice.   *Bank of Utica* v. *Bender*, 21 Wend., 643; *Raw-
don* v. *Redfield*, 2 Sandf., 178; *Belden* v. *Lamb*, 17 Conn.,
441; *Hartford Bank* v. *Stedman*, 3 id., 489.

2.   If due diligence was exercised in sending the notice,
the fact that the plaintiff was told, late in the evening of
July 6th, that the defendant had changed his residence, can-
not defeat his right to recover.   The statute (Gen. Statutes,
p. 349, sec. 6,) allows the sending of a notice by mail, when
the parties both reside in the same town.   It imposes no
greater diligence where the parties reside in the same town,
than the common law requires where they reside in different
towns.   *Requa* v. *Collins*, 51 N. York, 144.   Would a notice
mailed by the plaintiff after he reached home in the evening
of July 6th, and deposited in the New Haven post office,
addressed to the defendant either at New Haven or Fair
Haven, have been sent in time to bind him as indorser?   If
not, then the plaintiff certainly cannot be charged with not
having exercised due diligence.   That it was then too late for
him to send such notice the authorities prove beyond all ques-
tion, holding, as they do, that notice when sent by mail must
be sent as early as by the first mail of the day following the
dishonor, or at the very latest by the first mail which does
not leave at an unreasonably early hour of that day.   It can
not be necessary to cite authorities to this point.   And the
following facts must be considered in connection with the
case.   The finding shows that the plaintiff was not told that
the defendant had changed his residence until between sun-
down and dark of July 6th, and that it was after dark when
he reached home, which in July would certainly be as late as
9 P. M.   The letter the plaintiff wrote that night did not get
into the mail till 11 P. M.   And the note was in the vaults
of the bank, where it could not be had that night, or in the
hands of Ward in another town.   But conceding that when
the plaintiff was told that the defendant had changed his
residence, it was not then too late to send a notice of dis-

honor, his right of recovery is not thereby barred. For the purposes of protest and sending notices of dishonor, not the plaintiff, but the bank where the note was left for collection, or Ward the notary, is regarded in law as the holder of the note. *Manchester Bank* v. *Fellows*, 28 N. Hamp., 302; *Bartlett* v. *Isbell*, 31 Conn., 296; *Warren* v. *Gilman*, 17 Maine, 360; *Greene* v. *Fouley*, 20 Ala., 322; *Bowling* v. *Harrison*, 6 How., 248. Due diligence exercised by such holder for collection will be sufficient to bind the indorser, although the notice be mis-sent, even if the owner of the note could have told such holder for collection the true residence, and neglected to do so. *Bartlett* v. *Isbell*, 31 Conn., 296; *Hartford Bank* v. *Stedman*, 3 id., 489; *Garver* v. *Downie*, 33 Cal., 176: 1 Parsons on Cont., (5th ed.,) 280. It is also apparent from the finding that the defendant received the notice sent on July 3d, quite as soon as if it had been sent July 6th, addressed simply "New Haven" or "Fair Haven," and if so he cannot complain. *McClain* v. *Waters*, 9 Dana, 55; *Bradley* v. *Davis*, 26 Maine, 45.

*W. C. Case* and *L. P. Deming*, contra.

1. The plaintiff was bound to use due diligence to discover the residence of Rowe before sending any notice whatever. The fact that the note bore date at "East Haven," and was apparently endorsed there, not only did not justify Ward in sending notice to East Haven, but relaxed in no degree the rigid requirement to use "due diligence" to discover the residence of the indorser. *Barnwell* v. *Mitchell*, 3 Conn., 106; *Bank of Utica* v. *De Mott*, 13 Johns., 432; *Wilcox* v. *Mitchell*, 4 Howard, (Miss.,) 280; *Howland* v. *Adrain*, 30 N. Jer. Law R., 41; *Lawson* v. *Farmers' Bank*, 1 Ohio St., 206. Ward did not use due diligence to learn the residence of the indorser. He inquired of two of his clerks, who did not live in East Haven, and who told him they did not know Rowe, but believed he lived in East Haven. This surely was not enough. *Bank of Utica* v. *De Mott*, 13 Johns., 432; *Stuckert* v. *Anderson*, 3 Whart., 116; *Gilchrist* v. *Donnell*, 53 Misso., 591; *Galpin* v. *Hard*, 3 McCord, 394;

*Packard* v. *Lyon*, 5 Duer, 82; *Beveridge* v. *Burgess*, 3 Campb., 262. His inquiries of the plaintiff's clerks were no part of due diligence. *Spencer* v. *Bank of Salina*, 3 Hill, 520; *Bank of Utica* v. *Davidson*, 5 Wend., 588. Ward's inquiry of the plaintiff and the information given by the plaintiff go for nothing, because in this matter Ward was simply the agent of the plaintiff, his acts were the plaintiff's acts, his *laches* the plaintiff's *laches*, the information of each the information of both, and in this branch of the discussion they are to be treated as one person. *Lawrence* v. *Miller*, 16 N. York, 235; *Greenwich Bank* v. *Degroot*, 14 N. York Supreme Ct., 210; *Dodge* v. *Freedmen's Sav. & Trust Co.*, 93 U. S. Reps., 379; Daniel on Prom. Notes, § 341, and cases cited in note. The plaintiff then should have the benefit of all the diligence used by both. We have seen what Ward's diligence was. What did the plaintiff in his own person do? Absolutely nothing. He made no effort whatever to discover the residence of Rowe at the time the note matured, but for the information he gave Ward he relied entirely upon a statement made by Hubbard six months before. This inquiry is all the diligence used by the plaintiff, and this is insufficient. *Barker* v. *Clark*, 20 Maine, 156; *Davis* v. *Williams*, Peck, (Tenn.,) 191; *Woods* v. *Neeld*, 44 Penn. St., 86; *Whitridge* v. *Rider*, 22 Maryl., 548; *Staylor* v. *Ball*, 24 id., 183. Hubbard was in his office a day or two before the note matured, but he asked him nothing about the indorser. The plaintiff not only sought no opportunity to be informed, but neglected the opportunity which presented itself. Was this "ordinary or reasonable diligence, such as men usually exercise when their interest depends upon obtaining correct information?" In making inquiry he had only to go upon the street and ask any one of a score of people living in the town of East Haven, barely a mile away, and so connected with the city of New Haven that it is difficult to tell where one leaves off and the other begins. At all events he could have sent or gone this trifling distance, and put the question beyond dispute. A significant piece of evidence that the plaintiff had not used due diligence and knew that he had not, is found in the

fact that on the 6th of July, within due time, he went to East Haven to enquire for the indorser.

2.  But the statute is explicit in its requirement that "the holder or his agent shall, in due time, deposit a notice of such dishonor in the post office, with the postage prepaid, addressed to such party at the town in which he may reside." Is it not a fair construction, and indeed the only construction of this language, to say that if the holder at any time, within "due time," learns the actual residence of the indorser, he must address a notice to him at that residence? "Ignorance of change of residence excuses only so long as that ignorance continues." *Howland* v. *Adrain*, 30 N. Jers. Law R., 41. Suppose Ward, after mailing his notice on the 3d of July, addressed to the defendant at East Haven, had on his way home been informed that the defendant had actually been a resident of New Haven for months, and had paid no attention to it—had written no new notice addressed to the defendant at his actual residence—would not that have been fatal negligence on the part of Ward binding the plaintiff? Inability to discover the residence of the indorser excuses the proper service only so long as such inability continues. Chitty on Bills, 493; *Beale* v. *Parrish*, 20 N. York, 407. The plaintiff's ignorance of the indorser's residence ceased within the "due time" to give the notice prescribed by law. The plaintiff was bound to act upon this information; all the more because he was aware that the maker had absconded. He deliberately neglected his legal duty, to the detriment of the defendant, and wrote him two letters without informing him of the dishonor of the note. These letters were not notice because they contained no information. Daniel on Prom. Notes, §§ 974, 975.

PARDEE, J.  It appears in this case that up to the day of the maturity of the note in question the plaintiff had neither knowledge nor reason for believing that the endorser had changed his residence. The note bore date at East Haven; there the endorser had lived for forty years, including the day upon which he made the endorsement, and this he placed

in the hands of the maker of the note, presumably with knowledge that he intended to sell it in the open note market of New Haven, and probably to a person who would have no other information as to the endorser's residence than that furnished by the note and orally given by the maker.

The plaintiff having ascertained the truth as it was at the time of the purchase might well rest upon that, and was not thereafter called to make any inquiry into the matter until some information came to him which made it his duty so to do. The holders of notes and bills are not bound to a continual watch over the movements of endorsers, unless for good cause; the question as to diligence arises only when there is reason for action.

It is found that the endorser received very few letters; from this we may infer that his business transactions were also few; that his circle of acquaintance was small; that he might transfer himself alone, without family, for the distance of two or three miles, from the house where one daughter lived into a house with another, practically from one part of New Haven to another, without knowledge of others than his nearest neighbors and most intimate friends; and in fact the change was so quietly made as to fail of recognition in the city directory.

We infer too from the finding that after as before this change he visited the same three places in the center of the city; and it is found that after his return from England in May, up to the time of the maturity of the note, he spent most of his time tilling the land about his former home in East Haven. During this time if the plaintiff had seen him in New Haven nothing would have suggested a change, he might well have assumed that the residence indicated upon the note continued, might well believe and inform the notary that he lived in East Haven; and the notary, protesting for the collecting bank, might well act upon that information, supplemented as it was by the belief of two of the bank clerks living presumably within two miles of the endorser, that he lived in East Haven, although they had no personal acquaintance with him

By the combined force of these circumstances the endorser was well held by the notice of July 3d, directed to East Haven; he had in effect told the holder that he lived there when the latter bought the note; he had never given him any reason to believe that he had changed his residence, or occasion to make other inquiry than that which was made.

Monday, July 5th, 1880, was a national holiday. On the afternoon of Tuesday, July 6th, the plaintiff, learning that the note remained unpaid, went to East Haven to find the maker and endorser. He enquired of a former neighbor, who told him that the maker was without property, and that he went to parts unknown two days before the maturity of the note; also that the endorser had removed to New Haven, and lived in a house standing about seventy-five rods off from the plaintiff's most direct route back to that city. He received this information at about dark and returned to New Haven by another than the most direct route, without seeing the defendant, supposing that the notary had protested the note according to law.

On Saturday, July 10th, he informed the notary of the endorser's change of residence, and on the same day the notary mailed a second notice of protest directed to him at New Haven.

The legal effect of the deposit of the notice in the post office on July 3d was not destroyed by the reception of this information at sundown of Tuesday, July 6th. At that hour the business of the day had closed; the note was in the vault of the bank in New Haven; the notary was at his home in an adjoining town; possession of the note was the privilege of any one required to send notice of its protest, accuracy in description being requisite. At that hour the law allowed the plaintiff to return to his home; it did not require either himself or the notary to leave their respective homes and devote the evening to the labor of notifying the endorser. Practically and in the eye of the law the information came on Wednesday, July 7th, and, if so, placed no obligation upon either the plaintiff or the notary to send a second notice; for the first was well sent upon information acquired

by due and legal diligence in inquiry. The deposit of that notice post paid in the New Haven post office, even with its erroneous address, unalterably fixed the liability of the defendant, unless the corrected information came either to the plaintiff or the notary in time to require of one of them a second notice on Tuesday, July 6th; and this did not occur.

It is said in *Lambert* v. *Gheiselin*, 9 How., 552, that "when notice is sent after the exercise of due diligence a right of action immediately accrues to the holder, and subsequent information does not render it necessary for the holder to send another."

A new trial is advised.

In this opinion PARK, C. J., and BEARDSLEY, J, concurred; LOOMIS and GRANGER, Js., dissented as to the effect of the knowledge of the defendant's place of residence acquired by the plaintiff on the 6th of July.